2011-15-77 PERKINELMER v. INTEMA 2011-15-77 Mr. Rosenthal, when you're ready. May it please the courts. Yes, please. In this case, the district court made a threshold and fatal error in reconstruing the claims for the purpose of his anticipation and obviousness analysis. Taking what was a claim construction that he adopted for the purpose of infringement and sua sponte rewriting it by breaking it into two pieces and changing the words in very critical ways. For example, the claim talks about comparing the measured levels of at least screening markers in two trimesters while his construction is comparing distributions of marker levels. On the issue of distribution, while Judge Gertner's construction did leave out three words, those three words were not intended to change the meaning of the claim. She made it very clear she was adopting Perkinelmer's claim construction. She was not making any changes, she was just making it in her mind a little clearer. But she didn't intend to change the meaning of the claim, which was very clear from the file prosecution history. Those words were intended to help describe a type of statistical analysis of the data from the first and second trimester. A statistical analysis that had only three different kinds of analyses, the most popular is the multivariate Gaussian analysis. But that was what the file prosecution teaches. The examiner over and over again says, please put into the claim, in order to avoid the section 112 rejections, put into the claim language which describes the method of calculation. But Judge Gertner's claim does not include any reference to the observed relative frequency distribution. It has the word distribution, but in her opinion, she makes it very clear that she was not intending to change the meaning of the claim. She was intending to clarify that she was adopting opposition. My problem is that she engaged in a claim construction, and construction used the word distribution. It did not use any limitations on that. Now there might have been some rationale in her opinion, but you didn't object to the actual construction. And if she said she thought distribution made it more clear, I would assume that's because she was engaging in a construction. Well, Your Honor, I beg to differ, because the entire phrase which appears in the claim, in the determining clause of both Claim 1 and 20, and also appears in the first determining clause of Claim 20, dealing with the first trimester, that phrase has significance, and it's agreed to, by the way, on both sides. Neither side argued in Markman that distribution should be replacing observed relative frequency. Neither side, in their briefing on any of the motions in this case, made that argument. The arguments made about claim construction by Perkin-Elmer were consistently revisiting an argument made in Markman, and made in a request for reconsideration, that the issue of withheld versus whether a marker that was, whether the Claim 1 permitted one to give a first trimester risk evaluation. And Judge Gertner specifically ruled that it did. It didn't exclude that possibility. So Claim 1 and Claim 20 are similar in that regard. Both of them permit this first trimester risk. But he didn't, Judge Saylor didn't stop there. He made, he divided the claim into two pieces, and while the, and the second piece, he added the terms combining and single risk calculation, neither of which are found in the claim interpretation of Judge Gertner, nor are they found in the claim, nor are they found anywhere other than in Qadir. He actually plucked the interpretation out of the claim. And it makes a difference, because it is clear that Judge Saylor, in a footnote, says that that was a significant change, the distribution versus the language about observed relative frequency distributions. He took that as being significant, although I'm hard-pressed to understand it. The position of Perkin Elmer on this appeal is it makes no difference. The two are the same, and the consequence is the same. What they do is they go on to argue that somehow the possible-to-combine sentence in Qadir represents a statement of the determinant step, which it does not. What it does is it represents, and here we get to the analysis on validity, what the possible-to-combine sentence, the whole paragraph we've read as a whole, says, is that when we do a second-trimester test, having first performed the first-trimester NT test, we have this siphoning-off problem. Many of the Down syndrome patients leave, so that the results in a pure second-trimester sequential test are very inaccurate. They don't do very much good. You get too many false positives. Qadir recognized that problem. His solution is a risk adjustment. We should adjust the risk in the second-trimester so that fewer women are sent to invasive testing, because invasive testing carries a risk of loss of wanted pregnancies. The Down syndrome screening we're talking about here, in this case, is not dispositive. That's why they use the word odds. It's a little bit like gambling. They're doing a statistical analysis to say you're more likely than not to have the disease. What Dr. Wald's test, the integrated assessment in both of its embodiments, does is creates a much more accurate test than any known before, so that the number of women, and there are still some who have a false positive at whatever the cutoff that you pick, is reduced dramatically. I don't understand what it was that Dr. Wald brought to the table, so to speak, here, that suddenly made this more accurate. If you assume that at the table already was a first-trimester NT test and a second-trimester biochemical test, and all that's left is to do your best with the statistical methodology that's available to you to figure out where you fit on the, as you put it, the odds table. What is it that he brought that wasn't there before? What he brought to the table was the concept of holding or reusing. The concept of taking the first-trimester data, the raw data, the measured values, and combining them with the raw data, the measured values in the second trimester, into a calculation that created a single risk estimate. And it turned out, and it was not predictable with all due respect to Perkinoma, it was not predictable, it was not trivial, it turned out to produce the best test known to this day, actually, because what it did was it reduced, it increased the detection rate while at the same time reducing the false positive. Well, if you have two independent tests and they're both relatively reliable, and they're independent, they don't have imitative characteristics, then presumably, if you do both tests, you're going to reduce the risk of inaccurate results, right? That seems to me pretty straightforward. No, it turns out that it doesn't, because the… You mean it turns out that my proposition isn't true at all as a matter of statistics? It turns out your proposition is not true in this case. Now, but how about just as a general matter? If I am asking a question, not with respect to the particulars of this case, but just as a statistical measurement, I take a particular item that I have a test for that will tell me 90% accurate, I have an independent test that is not using effectively the same factors, and that test tells me 90% likely, then combining them, Gaussian, multivariate Gaussian or whatever, my method, I'm probably going to get over 90% accuracy, right? As a general matter. Well, I can't speak to… I mean, you… I can't speak to… it sounds very… which is the hindsight problem in this case. Well, but this is something that has taught in first year six courses. Except that we're not dealing with a first year statistics issue, we're dealing with a real world issue of screening for Down syndrome. And in a real world screening for Down syndrome, it turns out that the first trimester test being performed takes a body of people out of the sphere of the second trimester test and affects the validity of the second trimester test. So these are not two independent variables. And that is… the possible to combine sentence assumes independence. And it turns out in the real world, as the Souris and FASTA studies demonstrated, they're not quite independent. There are correlations between the results in the first trimester and the results in the second trimester. But it is not predictable and it was certainly disparaged at the time of this proposal. Now we're getting into your rebuttal time. Would you like to save it? I would like to save it. Very good. Why don't we hear from the other side and we'll save you three minutes of rebuttal. Thank you. May I please, court? Mm-hmm. I did want to cover… I not only want to cover the prior art in validity, but also section 101. We have an issue on that. I can address those in any way the court wants or in any order, but… Why don't you start with 101? 101. Is that all right? It's fine. I know we just had an opinion come down and so that changed the landscape and so did Mayo, changed the landscape a little bit. But in this case, you basically have two things. You have a data collection, which involves just two steps, the assays, and then you have an algorithm. And so there's really only three steps in here. And the two assay steps are common and routine steps. Intima has conceded throughout the prosecution history in the case that these data gathering steps, the assays, are all conventional, well-known steps. And the algorithm is also well-known as well. So the essence of this claim is really the algorithm, and that is unpatentable subject matter. Here's taking at least one indication from the Supreme Court. Is there any inventive concept here other than the algorithm? And the answer is no, and that's by their own admission. Why don't you specifically compare Mayo to this claim and tell us how you think they're similar or dissimilar. If you look at the Mayo claim, Mayo actually, the claims in this case are really similar, not just the Mayo but the Graham. And they're similar in the sense that you have an analyzing step. For example, you have specifically about Mayo. Mayo talks about administering the drug 6-thioguanine and then determining the level of 6-thioguanine. I'm sorry, I have allergies, so I'm sorry to fade out on you there. And then determining the level of 6-thioguanine. And following that, there's a step where you determine, based on the level, you determine whether you need to increase the medication or decrease. That's Mayo. In this case, you have assaying a sample to determine a marker level in trimester 1. Then you assay a sample to determine the level of the marker in trimester 2. And then there's a determining step, and that determining step is an algorithm. So there's a direct analogy to Mayo, to the facts of Mayo. Now if you look at Graham, it's a little simpler in that the claim has a performing some clinical test. And then there's a determining step following that, an algorithm. So if you look at those three cases together, this case, Graham, and Mayo, those are all kind of the same type of facts. Graham and CyberSource do refer specifically to data gathering steps not being sufficient to be transformative. But the Supreme Court didn't go down that analytical path, did it? Well, it didn't talk about data gathering. What the Supreme Court said is that these data gathering steps are not inventive. If they're common routine, then that doesn't save the claim. And that's the case here. Now I think in the CLS case, which came out yesterday, and I hope I have this right because there's a lot of quick reading on this, there were a lot of steps. And I think what the court was concerned about in that case was whether the claim was preempting the field. And because there were a lot more steps in that case, it was a narrower focus on the claim than you have in this case or in Mayo or in Graham's. And so the CLS case, the way I see it, was more like the Deer case, D-I-E-H-R case, rather than the cases that we're talking about here, which is the Prometheus and the Graham's case. It's much more like that. And in our case here, you're looking at a preclusive effect on research of new markers and of methods of assaying, which is what this claim would preempt. And so I think that what you're talking about here is the type of fear that the Supreme Court has in Prometheus about preempting a field. You mentioned that the claim, and I think we were speaking about Claim 1, contains the two measuring or assaying steps and the algorithm. What do you understand to be the disclosed or claimed algorithm that's at issue here? The claimed algorithm is basically comparing the marker levels with the affected and unaffected populations. And that's what the claim says. No matter what means is used to do the comparing? I guess my question is, I'm trying to find if there's an algorithm that is any more specific or limiting than simply saying assaying test 1 and assaying test 2 and using the data from those tests in addition to data of how those tests are results of those tests among other populations to calculate risk. Is there anything more to it than that? No, I think that's it. How broad is that? The specification says any known statistical method can be used. Let me ask you about the objection to Judge Thaler's characterization of Judge Gertner's claim construction. Did it really make a difference in his analysis, or did he seem to actually understand that you were still talking about comparing these markers to a broader distribution population? Well, I think it's the latter, Judge O'Malley, because if you read through the opinion, you can see that because he was addressing the inherency issue, and he talked about the affected and the unaffected populations, and in determining risk, you need to look at, I mean, that is just the way you calculate risk. And so if you look at the claim term, the claim term says, with observed relative frequency distributions of marker levels in Down syndrome pregnancies and unaffected pregnancies. That's basically the words, you know, and Judge Gertner shortened the observed relative frequency distributions to just the word distribution. But it's the same thing in the claim construction as in the claim, and Judge Thaler basically followed that. I mean, he found every element of the claim present, and in fact, there were very few elements that were in dispute. When my friend here across the aisle talks about Judge Thaler not following the claim construction or breaking it down into two questions, those two questions that he answered are the same two questions that they posed in their brief on summary judgment. He was basically responding to the way they characterized the issues that were open on summary judgment. So Judge Thaler definitely followed the claim construction in what I think is a very well-reasoned decision. What do you understand to be the point of Intimus expert Dr. Tannick explaining the difference between a group likelihood ratio, which he says Qadir calculates, and the kind of likelihood ratio that he says is used in the 103, which covers both group and individual likelihood ratios? It's a little hard to follow. I think what he's referring to is in Qadir, there's this table 1 down at the bottom of page 8 of 2028. I think he's referring to that where Qadir put together some statistics, but that's different from what's being referred to in the rest of the article where they're talking about calculating the risk for an individual. And in fact, if you take a look at the last column in the language that we focus most heavily on, which is on page 8, 2029, is the second full paragraph, the effect of introducing nuchal translucency there. That language talks about calculating an individual risk. So Qadir was focused on calculating individual risks, and if you read this as a whole, that's what it's about. Intima, however, they focus on this table 1 where just because they had the research, they put together the group risks in the table, but that has nothing to do with the teaching of the reference with respect to calculating the risk for individuals. So, Judge O'Malley, I disagree with what the expert is saying. I just don't think that's an accurate reading of the reference as a whole. I think it's taking the table out of context of the rest of the priorities. Did I adequately address the issues on 101? I think you did. Or at least answer all of your questions. Well, 101 is a gift that never stops giving in terms of questions, but you've covered all that we need for now. Okay, including anticipation? Well, if you want to speak to that, go ahead. Okay. You know, the prosecution is pretty clear here that the only thing missing in the prior art was this concept of taking the first trimester marker and combining it with the second trimester marker to come up with a more accurate risk analysis. Everything else is known. And the prosecution history is very clear that once you have that specific teaching, anybody can do this. If you look in the prosecution history, there's the RISH declaration where they come right out and say, look, if you have that teaching, you can do this. I don't think there's any dispute about that. If you look at Qadir, it's pretty clear on page 2029 what they're saying. And you have to put this into context. Again, what was going on in the field at the time was that people at first were trained to do second trimester markers. Then they found you could do first trimester markers, including this nuchal translucency. And so you had the two markers. And what Qadir says, and this is in the middle of the second column on 2029, what she says is based on our research, what we did is we did a sequential test. We did tests in the first trimester, tests in the second trimester, but we didn't do that right. We needed to do something else because we weren't subtracting for the women who came out of the population. And so you have to put this all into context. And what she said is you need to adjust somehow. You need to do something to the second trimester markers. And something that she suggests you do is combine the first and second into one single individual risk estimate. If you look at this Qadir, this is basically a road map for the 103 path. It basically says the same thing. Now one thing I wanted to respond to that Mr. Rosenthal said, he said that, Judge Bryson, in response to your question about statistics, he says well you need to look at the real world here. What's the real world? And he said you have to look at the real world of taking people out of the population. Well I think I just explained what Qadir, how Qadir handled that. And you see the same thing in Davies and these other references that we also included in our brief. You had no expert testimony on those other references though, did you? We did. On Davies, yes we did. And they moved to strike Davies on that basis and Judge Gertner denied the motion. So as far as I understand, Davies is in the case. Okay, but not the other two? No, the other two are in the case. We didn't move on those. They moved on summary judgment on those two and we responded. But one thing you see in all of those, and I'll make the point, I'll get back to, I wanted to get back to your point, Judge Bryson, is that you see the industry came to the same conclusion at the same time because what actually precipitated this solution was the problem of taking the positives that you had in the first trimester out of the population. So you needed to change the calculation a little bit. So you see the same thing happening not just in Kadir, but in Davies, the Ligonathan, and also the Schneider reference. They all do the same thing. They adjust for the second trimester based on pulling the positives out of the first. Now just to address this one again, Mr. Rosenthal talked about taking people out in the real world and everything else. But his invention primarily, as we've seen, is taking the marker from the first trimester and the second trimester. And what Wald was trying to do back then was not disclose first trimester results to women. So his invention originally came about, or his purported invention originally came about, without taking any women out of the population. So this is what Kadir suggested, and then later Wald came on to that, but originally he was not taking any women out of the population. But Judge Gertner concluded that the claims weren't so limited. Exactly, but that's exactly right, Judge O'Malley. I'm just responding to Mr. Rosenthal's statement that his claim solved this real world problem of taking women out of the population. But that isn't how it started. It started by just doing trimester one, trimester two, and then coming to one single individual risk estimate. In fact, there was a lot of controversy about that and whether those results, as an ethical matter, should be reported to the women. And Dr. Wald was involved in that controversy. So this invention didn't start out the way Mr. Rosenthal suggested it started out. That's all I'm trying to say in terms of real world. Okay. Thank you. Mr. Rosenthal, you have a little over three minutes. Thank you, Robert. I guess I should start with Mayo. Mayo is different from our case very materially. First of all, Mayo talks about a law of nature and nobody has claimed that this claim is directed to a law of nature. But more important, what Mayo is saying, and I think they're quoting from the Supreme Court in Fluke, that if these other steps add something to the algorithm, it doesn't have to be a lot, but add something to the algorithm, then you take it out of this pure law of nature and nothing else and apply it. Rubric. Unless it's well understood routine conventional activity previously engaged in. Except that what Dr. Wald has done is he's added, what he has added, he's added taking the results of the first trimester, the measured markers, taking the measured markers in the second trimester, the algorithm that is used to combine is multivariate Gaussian analysis or one of the other two choices. Any of the known statistical. Any of the known statistical, but there are only three, as the experts say. And none of them include risk adjustment. Risk adjustment doesn't give you the same result. It doesn't give you as good a result. And so he added something. He said take one, take at least one from each and make them different. That they shouldn't be the same marker. And that is enough to take it out of Mayo. Because it is this extra inventive concept. And I don't think Mayo requires very much. But it builds up data gathering which under cyber source wouldn't give you anything additional. I don't think that data gathering is a concept. It's discussed in DEER. It's mere data gathering. It's data gathering which is very narrowly subscribed. It's a well-known post pre-solution. Certainly Mayo expanded it to pre and post. But it's more than just mere data gathering. It is a specific, focused, unlike Graham's, which is the analogy that is being drawn here. Graham said take a test. This says do a specific thing in the first trimester. Do a specific thing in the second trimester. Take the measured values from both trimesters, at least one of which are different. That's the way the claim is interpreted. And apply it to a known statistical technique which gives you the best result. The standard of care in the United States. Unexpected. And it's very interesting. There are three sets of procedures. It's an unusual case. Three sets of procedures spoke to Kadir and Filigan-Anthony. All three of them, including Dr. Filigan-Anthony and Nicolaitis who is a co-author of the Snyder's reference. All three of them said in essence that Kadir and Filigan-Anthony taught a failed sequential test and Wahl taught something different. One of them liked it, two of them didn't. And they were contemporaneous. I just want to go to denial of emotions. Very briefly, if you would. Your time is expired, but you can go ahead and make your final point. All right. Davies is not definitely in this case. All that Judge Gertner did in denying the motions was to say that this is an issue she likes to treat in the context of the motions for summary judgment, not in a lemonade motion which we had brought. And so it's still in the case. Thank you. Thank you, counsel. The case is submitted.